Austin J. Miller (#033322)
RETAIL CAPITAL LLC
CREDIBLY OF ARIZONA LLC
1501 W. Fountainhead Pkwy, Suite 630
Tempe, Arizona 85282
Telephone:  (480) 498-6853
Email: amiller@credibly.com
Attorney for Plaintiffs

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Retail Capital LLC,  a New York limited liability company, doing business as Credibly; and Credibly of Arizona LLC, an Arizona limited liability company,<br><br>        Plaintiffs,<br><br>vs.<br><br>Corporate Client Services, LLC, a Florida limited liability company,<br><br>        Defendant. | Case No.<br><br>**COMPLAINT FOR:**<br><br>   **1. TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS** |

Plaintiffs Retail Capital LLC doing business as Credibly (hereinafter "Credibly") and Credibly of Arizona LLC (hereinafter "Credibly of Arizona") (collectively "Plaintiffs"), for their Complaint against Defendant, alleges the following based upon information and belief:

**Parties and Jurisdiction**

1.      Credibly, is a New York limited liability company doing business in Maricopa County, Arizona.

2.      Credibly of Arizona is an Arizona limited liability company doing business in Maricopa County, Arizona.

1

3.      Defendant, Corporate Client Services, LLC ("CCS"), is a Florida limited liability company that has caused events to occur within Maricopa County, Arizona out of which the causes of action herein alleged arise.

4.      Pursuant to 28 U.S.C. § 1332, this Court has jurisdiction over this action because the matter in controversy exceeds $75,000.00, exclusive of interest and costs, and the action is between citizens of different States.

5.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because Defendant has sufficient contacts with this District to subject it to personal jurisdiction at the time this action is commenced, and the acts and omissions giving rise to the causes of action asserted herein occurred in this District.

## General Allegations

6.      Plaintiffs repeat and incorporate all the allegations of this Complaint set forth above.

7.      Plaintiffs are in the business of providing small to medium-sized businesses (a "Merchant" or collectively, "Merchants") with business financing. Plaintiffs provide financing to Merchants through purchasing an amount of the Merchant's future payment receivables (called a 'merchant cash advance' and similar to invoice factoring) or through a business loan.

8.      Defendant is a seller of commercial debt relief services, and purports to provide business debt relief services for Merchants in exchange for consideration.

9.      Defendant's business practices described herein tortiously interfere with Plaintiffs' contracts.

10.     On information and belief, Defendant employs a standard business practice of intentionally targeting Merchants who contract with Plaintiffs (a "Customer" or collectively, "Customers") through various methods, including without limitation, searching for Plaintiffs' UCC-1 filings and then contacting Plaintiffs' Customers to sell

commercial debt relief services.

11.     Defendant is aware, or should be aware, that Plaintiffs' contracts with their Customers are secured debts[1], but continues to solicit its services in direct conflict with Section 2(C)(i) of Defendant's Business Debt Resolution and Settlement Agreement (the "Debt Relief Agreement(s)"): "*Each of the Enrolled Debts is unsecured business debt, and owed by you to the listed creditor in the amount listed on the Schedule of Enrolled Debts. If Corporate Client Services LLC discovers that an enrolled Debt is secured or is a consumer/personal debt, such Debt will be unenrolled and removed from the program without any liability on the part of Company.*" [Italics and underline added.] (*See* Debt Relief Agreement, a true and correct copy of which is attached hereto as **Exhibit 1**).

12.     Through these debt relief services, Defendant interferes with payments and remittances due to Plaintiffs under Plaintiffs' contracts with their Customers by intentionally and improperly inducing Plaintiffs' Customers to stop all remittances or payments in breach of the terms of their valid, lawful, and enforceable agreements with Plaintiffs and instead direct amounts equal to such payments and remittances to Defendant.

13.     At the time of Defendant's solicitations, the Customers are, in most cases, still performing on their contractual obligations with Plaintiffs.

14.     On information and belief, during such contact with Plaintiffs' Customers, Defendant knowingly and intentionally gives incorrect legal advice and makes false statements about Plaintiffs' agreements and the terms therein.

15.     On information and belief, Defendant falsely implies that it has a favorable working relationship with Plaintiffs, misleading Plaintiffs' Customers to believe that

---

[1] In the case of Plaintiffs' merchant cash advance contracts, the obligation does not become secured until the Customer breaches the contract. Additionally, the merchant cash advance is more accurately described as an 'obligation' instead of a 'debt', but this Complaint will refer to both business loans and merchant cash advances as 'debt' for convenience and consistency.

3

Defendant can likely achieve a settlement at a fifty percent (50%) reduction of the Customer's outstanding balance.

16.     On information and belief, Defendant promises to save the Customer money on their existing agreements with Plaintiffs by renegotiating the amount and/or schedule for contractual payments or remittances, and/or settling the debt owed to Plaintiffs for less than the outstanding balance.

17.     On information and belief, Defendant also represents that it can significantly reduce the Customer's contractual obligation or avoid paying altogether because the Customer can claim "hardship" as a defense to avoid their payment obligations.

18.     The promises Defendant makes to Plaintiffs' Customers are false and misleading and are made for the purpose of inducing Plaintiffs' Customers to breach their agreements with Plaintiffs and to subsequently enter into an exploitive agreement with Defendant.

19.     Defendant requires Plaintiffs' Customers to enter into the Debt Relief Agreement for its commercial debt relief services (the "Debt Resolution Program").

20.     Plaintiffs' Customers will enroll their outstanding debt with their creditors into the Debt Resolution Program offered through the Debt Relief Agreement.

21.     Defendant expressly states in its agreement that 50% of the outstanding debt that is enrolled into the Debt Resolution Program is the amount estimated to settle the enrolled debts – regardless of factors determining the Merchant's ability to pay its debt or factors determining the creditor's willingness to negotiate the outstanding debt.

22.     The Debt Relief Agreement requires the Customer to make weekly payments into a "Settlement Account" until an amount equal to 75% of the enrolled debt is deposited into the Settlement Account, from which the Defendant collects an amount equal to 25% of the enrolled debt for its debt relief fees and purportedly uses the remaining 50% to negotiate payment plans or lump sum settlements with creditors.

23.     As a direct and proximate result of entering into the Debt Relief Agreement

with Defendant, either on their own volition, or pursuant to guidance and/or instruction from Defendant, Customers will stop making payments or remittances to Plaintiffs, will instruct their bank to issue stop-payments, and/or will cut off Plaintiffs' contractually authorized access to their business bank accounts, all of which are violations of their contracts with Plaintiffs.

24.     After the Customer breaches a Plaintiff's contract, as instructed by Defendant, the Plaintiff makes multiple attempts to contact the Customer to cure the default.

25.     Plaintiffs rarely, if ever, receive a response from the Customer because the Debt Relief Agreement grants Defendant a Power of Attorney to handle all future debt-related communications.

26.     However, pursuant to Section 3(A) of the Debt Relief Agreement, Defendant typically does not make any communication attempts with creditors on behalf of the Customer until the Settlement Account exceeds a certain percentage of the total projected funds to be allocated: "We will usually, however, begin making negotiated settlement offers to your creditors only after the accrued funds in your settlement account exceeds 20% of each debt" (*see Exhibit 1*).

27.     As a direct and proximate result of Defendant's interference with Plaintiffs' contracts, Plaintiffs are unable to resolve their Customers' defaults, and must pursue litigation against their Customers.

28.     On information and belief, Defendant knows Plaintiff will bring a civil action against the Customer for breach of contract after a certain period of no payments and communication.

29.     It is to the benefit of Defendant for a lawsuit to be brought against the Customer because the Defendant will not be subject to the "Minimum Performance Standard" as defined in Section 6 of the Debt Relief Agreement and instead will immediately be entitled to Defendant's fees regardless of whether a settlement agreement

is achieved with a creditor: "<u>Minimum Performance Standard Does Not Apply to the Following Types of Debt: (ii) Any debt which is subject to a lawsuit at the time of this Agreement's execution or at any time thereafter…</u>"(*see Exhibit 1*).

30.     Customers will sometimes withdraw from Defendant's Debt Resolution Program when the customer realizes that Defendant is not fulfilling its promises.

31.     However, the Defendant does not return the customer's funds after the withdrawal, but instead deducts its unearned fee, as described above, from the Settlement Account and only returns the remaining amount, if any, as explicitly stated in Section 4(A) of the Debt Relief Agreement: "If you directly negotiate with, enter into a settlement agreement with, make payment to, or withdraw a creditor from this Program, Corporate Client Services LLC shall be entitled to a fee of twenty percent (25%) [sic] of the balance then owing to that creditor, and the creditor shall be immediately removed from the program" (*see* Exhibit 1) . As a result, Defendant has done nothing to assist the Customer and the Customer no longer has the funds needed to settle its debt or cure any default with Plaintiffs.

32.     As neither the Defendant nor the Customer work with the Plaintiffs during these periods, the Plaintiffs are left with no viable alternative other than to file a lawsuit to enforce the Customer's obligations. If the Customer is sued by Plaintiffs, Defendant will, among other things, offer legal services through an affiliate program to which the customer makes additional payments in exchange for an attorney to be assigned to handle certain legal services offered through the affiliate program.

33.     After filing suit against the Customer, Plaintiffs continue to attempt to resolve or settle the account but are often unable to get in contact with the Customer and/or are directed to communicate only with the Defendant. If Defendant has hired an attorney to represent the Customer in the litigation, Plaintiffs are unable to communicate with the Customer and must communicate through counsel.

34.     On information and belief, the Customer's attorney does not communicate

6

with the Customer, but instead communicates only with the Defendant. The Customers are rarely, if ever, put in contact with their attorney and have no control over the litigation or the outcome of their case.

35.     The attorney(s) hired by the Defendant to represent the respective Customers, consistently and as a standard legal practice, refuse to engage in litigation, fail to file timely pleadings, fail to properly serve Plaintiffs with their responsive pleadings, and fail to appear at hearings. The attorney's (and Defendant's) failure to uphold their legal and contractual obligations to represent the customer have routinely resulted in summary judgment being entered against the Customer, demonstrating a failure to carry out the fiduciary duties owed to the customer, a violation of attorney ethics, and could constitute legal malpractice.

36.     Defendant has induced at least 33 of Plaintiffs' Customers to breach their respective agreements with Plaintiffs, resulting in substantial injury to Plaintiffs.

37.     At the time of Defendant's solicitations, the Customers are, in most cases, still performing on their contractual obligations with Plaintiffs.

38.     Defendant's business practices described herein tortiously interfere with Plaintiffs' valid, lawful, and enforceable contracts.

39.     Additionally, Plaintiffs' Customers are falling prey to Defendant's calculated targeting of the Plaintiffs. On information and belief, Defendant searches for Plaintiffs' UCC filings, and then induces the Customer to enter into a Debt Relief Agreement with Defendant. Defendant intentionally targets and injures the Plaintiffs, and in doing so, also injures the Customers.

40.     When Customers undergo business hardships which affect their ability to make payments or remittances, Plaintiffs will generally offer various types of assistance. However, as a result of Defendant's tortious interference with Plaintiffs' contracts, Plaintiffs are not able to assist their Customers with payments or remittances, or enroll their Customers in the many programs offered by Plaintiffs that are intended to help their

Customers get back on track with their payment or remittance obligations, because the Customers' funds are redirected to Defendant and Plaintiffs are often unable to communicate with their Customers to so assist them.

41. Additionally, as a result of Defendant's tortious interference with Plaintiffs' contracts, Plaintiffs are unable to receive their contracted-for payments or remittances from their Customers, thereby continually and consistently being injured by Defendant's actions.

42. Plaintiffs seek compensatory damages for the actions Defendant has already committed, and injunctive relief to prevent Defendant from continuing their tortious conduct in the future.

## FACTUAL BACKGROUND

### A. The ProWire MCA

43. On or about January 9, 2021, Plaintiff Credibly provided a merchant cash advance to ProWire Tech Inc. doing business as ProWire Tech ("ProWire") wherein Raul E. Rodriguez ("Rodriguez") and Carlos Martinez ("Martinez") entered into the contract on behalf of ProWire as its owners and also personally guaranteed the performance of ProWire (the "ProWire Agreement"). A true and correct copy of the ProWire Agreement is attached hereto as **Exhibit 2**.

44. Pursuant to the ProWire Agreement, ProWire contracted for the advance of funds for the Purchase Price of $40,200.00 in exchange for a daily Remit Amount of $234.22 with an Amount Sold of $56,682.00.

45. As with all merchant cash advances offered by Plaintiff, the ProWire Agreement included a provision allowing ProWire to "true up" its remittances whereby ProWire could submit its business bank statements to show its actual receivables, and could be credited in the event the amounts remitted were greater than the amounts due under the ProWire Agreement.

46. After entering into the ProWire Agreement, ProWire began timely making

8

its remittances pursuant to the ProWire Agreement.

47.    On or about May 5, 2021, Defendant solicited ProWire's business for the purposes of selling commercial debt relief services.

48.    Defendant contacted ProWire directly in order to induce ProWire to enter into a Debt Relief Agreement with Defendant, promising to help ProWire save money.

49.    On information and belief, Defendant made false accusations that Plaintiff's contract with ProWire was a disguised, usurious loan and therefore illegal, and promised to reduce ProWire's remittances owed to Plaintiff if ProWire entered into a Debt Relief Agreement with Defendant.

50.    On information and belief, as a result of Defendant's solicitation of ProWire, ProWire was induced into entering a Debt Relief Agreement ("ProWire Debt Relief Agreement") with Defendant.

51.    Prior to being contacted by Defendant, ProWire had timely made all contractual remittances owed to Plaintiff.

52.    On information and belief, Defendant advised and/or instructed ProWire to stop making its contractual remittances to Plaintiff.

53.    On or about May 5, 2021, ProWire placed a stop payment on its contractual remittances thus revoking remittances to Plaintiff and breaching the terms of the ProWire Agreement.

54.    The ProWire Agreement became a secured debt upon ProWire's breach.

55.    Due to entering into the ProWire Debt Relief Agreement with Defendant, ProWire was unable and/or unwilling to continue to remit to Plaintiff its full contractual remittances.

56.    Defendant was aware that injury to Plaintiff and Plaintiff's Customers was a likely outcome as a result of its tortious interference, and is illustrated in Section 2.C(iv) of Defendant's Debt Relief Agreement:

**(iv) Effects of Participation in a Debt Resolution Program:**

9

Failing to make your minimum monthly payments to your Creditors may be breaking the terms of agreements with your Creditors, and (a) will likely adversely affect your creditworthiness, credit report, and credit score, and (b) may lead creditors to increase financial charges, add late fees, and pursue litigation or other legal collection actions.[…]

**[Exhibit 1]**

57.    Defendant's intentional and improper tortious interference with Plaintiff's ProWire Agreement was intended to negatively impact and injure the Plaintiff. Defendant instructed and/or induced ProWire to breach the ProWire Agreement with Plaintiff so Defendant could then collect its service fees which resulted in conversion of funds in which Plaintiffs had a security interest.

58.    As a result of Defendant's interference with the ProWire Agreement, Plaintiff was forced to settle the ProWire account on terms less favorable than those originally contracted for, representing an injury to Plaintiff caused by Defendant's tortious conduct.

59.    Also, as a direct and proximate result of Defendant's interference with the ProWire Agreement, ProWire's business operations were disrupted and Plaintiff entered a judgment against the Customer parties to the ProWire Agreement, representing injuries to ProWire, Rodriguez, and Martinez that would not have otherwise occurred.

60.    On information and belief, ProWire was dissatisfied with Defendant and regretful that it had entered into the ProWire Debt Relief Agreement.

**B.  The DDMMD Loan**

61.    On or about June 25, 2020, Plaintiff Credibly of Arizona provided a Business Loan and Security Agreement to DDMMD Logistics Corp. doing business as DDMMD Logistics ("DDMMD") wherein Hector J. Rojas ("Rojas") entered into the contract on behalf of DDMMD as its owner and also personally guaranteed the payment

and performance of DDMMD (the "DDMMD Agreement"). A true and correct copy of the DDMMD Agreement is attached hereto as **Exhibit 3**.

62.     The DDMMD Agreement is a secured debt.

63.     Pursuant to the DDMMD Agreement, DDMMD contracted for the receipt of funds in the Principal Amount of $69,600.00 in exchange for a weekly Payment Amount of $2,708.87 with a Total Repayment Amount of $95,352.00.

64.     On or about August 10, 2020, Defendant solicited DDMMD's business for the purposes of selling commercial debt relief services.

65.     Defendant contacted DDMMD directly in order to induce DDMMD to enter into a Debt Relief Agreement with Defendant, promising to help DDMMD save money.

66.     On information and belief, Defendant made false accusations that Plaintiff's loan with DDMMD was usurious and/or illegal, and promised to reduce DDMMD's payments owed to Plaintiff if DDMMD entered into a Debt Relief Agreement with Defendant.

67.     On information and belief, as a result of Defendant's solicitation of DDMMD, DDMMD was induced into entering a Debt Relief Agreement ("DDMMD Debt Relief Agreement") with Defendant.

68.     Prior to being contacted by Defendant, DDMMD had not missed any contractual payments owed to Plaintiff.

69.     On information and belief, Defendant advised and/or instructed DDMMD to stop making its contractual payments to Plaintiff.

70.     On or about August 14, 2020, DDMMD placed a stop payment on its contractual payments thus revoking payments to Plaintiff and breaching the terms of the DDMMD Agreement.

71.     Due to entering into the DDMMD Debt Relief Agreement with Defendant, DDMMD was unable and/or unwilling to continue to pay to Plaintiff its full contractual payments.

72.     Defendant was aware that injury to Plaintiff and Plaintiff's Customers was a likely outcome as a result of its tortious interference, and is illustrated in paragraph 2.C(iv) of Defendant's Debt Relief Agreement:

**(iv) Effects of Participation in a Debt Resolution Program:**

Failing to make your minimum monthly payments to your Creditors may be breaking the terms of agreements with your Creditors, and (a) will likely adversely affect your creditworthiness, credit report, and credit score, and (b) may lead creditors to increase financial charges, add late fees, and pursue litigation or other legal collection actions.[…]

**[Exhibit 1]**

73.     Defendant's intentional and improper tortious interference with Plaintiff's DDMMD Agreement was intended to negatively impact and injure the Plaintiff. Defendant instructed and/or induced DDMMD to breach the DDMMD Agreement with Plaintiff so Defendant could then collect its service fees which resulted in conversion of funds in which Plaintiffs had a security interest.

**C. <u>Defendant's Interference with Arizona Contracts as a Standard Business Practice</u>**

74.     Defendant regularly interferes with contracts by and between Plaintiffs and Plaintiffs' Customers.

75.     The contracts at issue herein that Defendant interferes with are Arizona contracts.

76.     Defendant regularly interferes with and induces breaches of contracts by and between Plaintiffs and Plaintiffs' Customers.

77.     Defendant is aware that Plaintiffs are located in and/or do business in Arizona.

78.     Prior to inducing Plaintiffs' Customers to breach the terms of their respective agreements, Defendant is aware that Plaintiffs are located in and do business in

Arizona and is aware that any injuries to Plaintiffs as a result of the breach of the Customers' agreements, and Defendants' interference of such agreements, are borne by Plaintiffs in Arizona.

79.     Defendants' business practices described herein are intentional and constitute tortious interference with Plaintiffs' contracts.

80.     As a direct and proximate result from Defendant's interference, at least 33 of Plaintiffs' Customers, with account balances totaling in excess of $2 million, have breached their agreements with Plaintiffs.

### FIRST CAUSE OF ACTION

### (Tortious Interference With Contractual Relations)

81.     Plaintiffs repeat and incorporate all the allegations of this Complaint set forth above.

82.     Plaintiff Credibly, ProWire, Rodriguez, and Martinez entered into the ProWire Agreement on or about January 9, 2021.

83.     Defendant was aware of the ProWire Agreement between Plaintiff Credibly, ProWire, Rodriguez, and Martinez, and intentionally sought out to interfere with Plaintiff's agreement by specifically searching Plaintiff's UCC-1 filings.

84.     Defendant solicited ProWire when it contacted ProWire, Rodriguez, and Martinez for the purpose of selling commercial debt relief services and inducing ProWire to breach the ProWire Agreement with Plaintiff in favor of making payments to Defendant instead.

85.     Upon information and belief, Defendant then used ProWire's deposit payments to pay Defendant's service fees, and only planned on using any remaining amount, if any, to settle with Plaintiff.

86.     ProWire, Rodriguez, and Martinez breached the ProWire Agreement with Plaintiff as a result of Defendant intentionally and improperly interfering with the ProWire Agreement.

87.     Plaintiff has suffered damages as a result of Defendant's tortious interference with the ProWire Agreement.

88.     Plaintiff Credibly of Arizona, DDMMD, and Rojas entered into the DDMMD Agreement on or about June 25, 2020.

89.     Defendant was aware of the DDMMD Agreement between Plaintiff Credibly of Arizona, DDMMD, and Rojas, and intentionally sought out to interfere with Plaintiff's agreement by specifically searching Plaintiff's UCC-1 filings.

90.     Defendant solicited DDMMD when it contacted DDMMD and Rojas for the purpose of selling commercial debt relief services and inducing DDMMD to breach the DDMMD Agreement with Plaintiff in favor of making payments to Defendant instead.

91.     Upon information and belief, Defendant then used DDMMD's deposit payments to pay Defendant's service fees, and only planned on using any remaining amount, if any, to settle with Plaintiff.

92.     DDMMD and Rojas breached the DDMMD Agreement with Plaintiff as a result of Defendant intentionally and improperly interfering with the DDMMD Agreement.

93.     Plaintiff has suffered damages as a result of Defendant's tortious interference with the DDMMD Agreement.

94.     Plaintiffs have entered into many funding agreements with numerous Customers.

95.     These funding agreements constitute valid contractual relationships between Plaintiffs and their Customers.

96.     Defendant is aware of Plaintiffs' funding agreements and that they are secured debts, intentionally and improperly seeks to interfere with Plaintiffs' agreements, and locates Plaintiff's Customers by specifically searching Plaintiffs' UCC-1 filings.

97.     Upon information and belief, Defendant solicits many of Plaintiffs' Customers for the purpose of selling debt relief services and induces them to breach their

14

respective agreements with Plaintiffs, in favor of making payments to Defendant instead, resulting in conversion of funds in which Plaintiffs have a security interest.

98.     Defendant then uses the Customer's deposit payments into their Settlement Accounts to pay Defendant's service fees (for services not rendered), and represents that Defendant plans on using the remaining amount, if any, to pay to Plaintiffs.

99.     Upon information and belief, many of Plaintiffs' Customers have breached their respective agreements as a result of Defendant's intentional interference with Plaintiffs' agreements.

100.     Plaintiffs have incurred damages and suffered other injuries as a result of Defendant's tortious interference with Plaintiffs' agreements and the subsequent breaches caused by Defendant's actions described herein.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Retail Capital LLC, a New York limited liability company doing business as Credibly, and Credibly of Arizona LLC, an Arizona limited liability company, respectfully request preliminary and permanent injunctive relief, judgment in their favor and against Defendant, Corporate Client Services, LLC, and request compensatory damages in amount to be determined at trial, but no less than $500,000.00, special damages, pre-judgment and post-judgment interest, attorneys' fees and costs, and such additional and further relief this Court deems just and proper.


**RESPECTFULLY SUBMITTED** this 16th day of November, 2021.


**RETAIL CAPITAL LLC**
**CREDIBLY OF ARIZONA LLC**


/s/ Austin J. Miller
Austin J. Miller, Esq.
4026 N. Miller Road, Suite B200

Scottsdale, AZ 85251
Attorney for Plaintiffs